**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

MYRON WILLIAMS, individually and as
Administrator Ad Prosquendum of the
ESTATE OF BRENDA WILLIAMS,
LOUISE WILLIAMS, individually and as
guardian ad litem for ALANA WILLIAMS,
a minor,

       Plaintiffs,

         v.

CITY OF SCRANTON, *et al.*,

       Defendants.

CIVIL ACTION NO. 3:10-CV-388

(JUDGE CAPUTO)

## MEMORANDUM

This case arises from the May 28, 2009 fatal shooting of Brenda Williams by three officers of the Scranton Police Department. Plaintiff Myron Williams, the administrator of the decedent's estate, and Plaintiff Louise Williams, the mother of the decedent and guardian of her minor daughter, bring this action under 42 U.S.C. § 1983 and Pennsylvania state law. Presently before the Court is a Motion for Summary Judgment (Doc. 90) filed by Defendants City of Scranton (the "City"); Scranton Police Department (the "Department" or "SPD");[1] SPD Officers James Smith, Jason Knoch, and Eric Jordan; and Corporal Robert Stanek (hereinafter referred to either individually or as the "Scranton Defendants"). The Scranton Defendants seek summary judgment as to all claims brought against them by Plaintiffs. For the reasons that follow, the motion for summary judgment will be granted.

## BACKGROUND

On the evening of May 28, 2009, the SPD was called by Louise Williams' next door neighbors about a domestic disturbance. (Jordan Dep. at 26:15–17, 27:17–21; Smith Dep.

---

[1]     The City and the SPD are considered to be one entity for purposes of this case. *See Bonenberger v. Plymouth Twp.*, 132 F.3d 20, 25 n.4 (3d Cir. 1997) ("As in past cases, we treat the municipality and its police department as a single entity for purposes of section 1983 liability.").

at 59:13–16.)  SPD Officers James Smith and Eric Jordan responded to the call and arrived at the complainants' house shortly after 10:00 P.M.  (Jordan Dep. at 26–27; Smith Dep. at 58:3–5.)  The complainants told the officers that Brenda Williams, Louise's adult daughter, had been harassing them by repeatedly banging on their front door and yelling at them. (Jordan Dep. at 26:15–22, 27:5–22; Smith Dep. at 60:12–22.)  They also stated that they feared being assaulted by Ms. Williams, whom the female complainant was "terrified" of. (Smith Dep. at 60:12–61:2.)  Prior to this event, Officer Smith had interacted with Ms. Williams multiple times in person and over the telephone (*Id.* at 44:8–45:20) and thought that she may have had "mental health issues" based on their interactions (*Id.* at 56:13–17). On one such occasion, he backed away from her because she had gotten very close to him and appeared to want to assault him.  (*Id.* at 47:16–48:10.)

After speaking with the complainants, Officers Smith and Jordan proceeded to Ms. Williams' apartment, which was one block away.  (Jordan Dep. at 28:23–29:1; Smith Dep. at 62:3–17.)  When the officers arrived and knocked on the apartment building's front door around 10:40 P.M., Ms. Williams answered the door without any clothing on, asked them an unintelligible question, slammed the door, and ran upstairs.  (Jordan Dep. at 30:20–32:9; Smith Dep. at 68:25–69:25.)  The officers entered the building, walked upstairs to Ms. Williams' apartment, and entered through the open front door, as her appearance and behavior led them to determine that she was not taking care of herself.  (Jordan Dep. at 32:10–16, 33:12–18; Smith Dep. at 71:2–72:10.)  They found her lying in bed, partially covered with a sheet, and smoking cigarettes.  (Jordan Dep. at 34:18–35:1; Smith Dep. at 76:6–19.)  Although the officers attempted to speak with her, she would not respond and instead cursed and yelled incoherently at them, including statements about "Janie" or "Jamie" going to heaven.  (Jordan Dep. at 36:10–37:24; Smith Dep. at 80:9–81:9.)  Officer Smith, who goes by "Jamie" (Flynn Dep. at 18:13–15), was unsettled by those statements

(Smith Dep. at 80:24–81:9). The officers looked around the apartment for weapons or drugs. (Jordan Dep. at 48:25–50:24; Smith Dep. at 82:3–83:15.) Although they observed several knives on top of the oven, the officers did not secure them because Ms. Williams did not have immediate access to them. (Jordan Dep. at 50:6–51:10; Smith Dep. at 83:16–24, 84:14–85:9.) Officer Smith called for an ambulance and EMTs for a possible "302 commitment."[2] (Jordan Dep. at 38:7–23; Smith Dep. at 85:10–19.) The officers also notified their shift supervisor that they would possibly be going over their shift, which ended at 11:00 P.M, and were told that someone would come to relieve them. (Jordan Dep. at 38:2–6; Smith Dep. at 86:9–23, 88:2–7.)

Kevin Yetkowskas and David Flynn, who worked as an EMT and paramedic, respectively, for Community Life Support (Flynn Dep. at 6:2–6, 15:20–25) responded to the call with an ambulance (Jordan Dep. at 42:16–21; Smith Dep. at 91:7–13). Corporal Stanek and Officer Jason Knoch arrived soon afterward at approximately 11:00 P.M. (Smith Dep. at 87:25–88:13). Corporal Stanek discussed the situation with Officers Smith and Jordan. (Jordan Dep. at 41:17–42:15, 43:24–44:15; Smith Dep. at 90:8–25; Stanek Dep. at 42:13–43:18.) He then turned off Ms. Williams' television, which was very loud, and Ms. Williams responded by leaving the bed and turning it back on. The two proceeded to turn the television off and on several times in until Corporal Stanek unplugged it. (Jordan Dep. at 51:11–52:18; Smith Dep. at 92:3–93:7; Stanek Dep. at 44:12–23.) In addition to talking with Officers Smith and Jordan, Corporal Stanek spoke with Mr. Flynn to determine whether a 302 commitment of Ms. Williams should occur. (Flynn Dep. at 22:14–24:10; Stanek Dep. at 35:14–24, 38:5–15.) Mr. Flynn did not think that Ms. Williams should be involuntarily

---

[2]     Section 302 of Pennsylvania's Mental Health Procedures Act, 50 Pa. Cons. Stat. Ann. § 7101 *et seq.*, provides for the involuntary commitment of person who is dangerous to themselves or others due to a mental illness for purposes of emergency evaluation and treatment. 50 Pa. Cons. Stat. Ann. § 7302.

committed (Flynn Dep. at 24:1–6; Stanek Dep. at 35:14–24, 38:5–15), but Officers Smith and Jordan thought that a 302 commitment was proper (Jordan Dep. at 38:24–39:13; Smith Dep. at 97:2–6). As the ranking officer on the scene, Corporal Stanek, who had previously performed about seventy 302 commitments, decided that Ms. Williams should not be involuntarily committed because she did not pose a danger to herself or others. (Stanek Dep. at 36:17–24, 43:19–44:4.) Instead, he ordered Officer Knoch to copy her information from a previous citation lying on a nearby table so that a disorderly conduct citation could later be sent to her. (Knoch Dep. at 43:2–23; Stanek Dep. at 51:1–23.) The officers were preparing to leave the apartment after Officer Knoch did so. (Jordan Dep. at 54:2–10.)

While Officer Knoch was copying down Ms. Williams' information, she quickly exited her bedroom, passed behind him, and entered her kitchen. (Knoch Dep. at 48:1–24; Stanek Dep. at 52:18–20.) Corporal Stanek did not prevent her from going to the kitchen because she was not under arrest and was not a danger to herself or others. (Stanek Dep. at 52:21–53:3.) The officers heard metal clinking sounds coming from the kitchen and Officer Smith informed them that knives were in there. (Jordan Dep. at 55:18–25; Smith Dep. at 101:13–102:4.) Ms. Williams then emerged from the kitchen with a large knife. (Jordan Dep. at 56:4–13; Knoch Dep. at 50:1–19; Smith Dep. at 105:9–11; Stanek Dep. at 56:6–12.) The officers pulled their service weapons and ordered her to stop and put down the knife. (Jordan Dep. at 59:17–24; Knoch Dep. at 52:5–8; Smith Dep. at 112:19–24, 126:21–127:3; Stanek Dep. at 57:19–22.) As she refused and continued toward Officer Smith while pointing the knife at him, he backed up from the living room to the bedroom. (Smith Dep. at 112:14–18, 116:16–117:4; Stanek Dep. at 56:20–24, 57:15–22, 58:5–12, 59:1–6.) After issuing several warnings, which Ms. Williams refused, Corporal Stanek, Officers Smith, and Officer Knoch shot her. (Knoch Dep. at 57:5–8; Smith Dep. at 120:9–122:24; Stanek Dep. at 61:1–63:3.) It was a matter of seconds between Ms.

Williams appearing with the knife and being shot. (Knoch Dep. at 53:11–15; Smith Dep. at 104:12–16.) Ms. Williams was several feet away from Officer Smith when she was shot. (Knoch Dep. at 55:11–13; Smith Dep. at 118:23–119:2; Stanek Dep. at 58:18–25.)

After being shot, Ms. Williams fell to the ground and on top of the knife. (Jordan Dep. at 64:4–10; Smith Dep. at 122:25–123:5; Stanek Dep. at 63:6–22.) The officers called for the medical personnel on the scene to attend to Ms. Williams. (Jordan Dep. at 69:2–15; Knoch Dep. at 65:3–12; Stanek Dep. at 66:10–67:5.) The medical personnel arrived within seconds, began attending to Ms. Williams, and moved her to the ambulance within minutes. (Stanek Dep. at 66:10–67:5; Jordan Dep. at 69:2–20.) Although Ms. Williams was examined, given CPR, and taken to the Community Medical Center ("CMC") in Scranton by ambulance, she was pronounced dead in CMC's trauma center. (Flynn Dep. at 36:12–18, 37:13–17, 38:18–40:18.)

Following the incident, the SPD created a Crisis Intervention Team ("CIT") Program which trains officers about mental illness and how to interact with mentally ill individuals in certain situations. (Gerrity Dep. at 16:8–17:5.) Although some of the officers involved remembered taking police academy classes that addressed dealing with mentally ill individuals (Jordan Dep. at 9:7–11; Smith Dep. at 11:15–22; Stanek Dep. at 11:6–18), the SPD did not provide similar training before establishing the CIT Program (Gerrity Dep. at 17:6–9). In 2000, the SPD issued a policy memo outlining proposed procedures for dealing with mentally ill individuals and effecting voluntary and involuntary commitments. (Doc. 99, Ex. C.) The memo instructed officers resolving a situation involving a possible mental patient to determine whether the individual is an immediate threat to him or herself or others and if any weapons are involved or accessible to the individual. (*Id.*) The proposed policy was never formally implemented because the officers' union, which had no input in drafting it, rejected it, but the procedures were implemented. (Stanek Dep. at 20:2–21:6.)

On February 22, 2010, Plaintiff Myron Williams, the administrator of Brenda Williams' estate, and Plaintiff Louise Williams, the guardian of Brenda Williams' minor daughter, Alana, commenced this action against numerous defendants, alleging various state and federal claims. (Doc. 1.) As a result of the Court granting several motions to dismiss (Doc. 33, Doc. 73), the Scranton Defendants are the only defendants remaining in this matter. The Scranton Defendants filed for summary judgment on all of Plaintiffs' claims on July 6, 2012. (Doc. 90.) The motion has been fully briefed and is ripe for this Court's review.

## ANALYSIS

### I. Legal Standard

#### A. Summary Judgment

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Summary judgment is appropriate when 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Wright v. Corning*, 679 F.3d 101, 103 (3d Cir. 2012) (quoting *Orsatti v. N.J. State Police*, 71 F.3d 480, 482 (3d Cir. 1995)). A fact is material if proof of its existence or nonexistence might affect the outcome of the suit under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Where there is no material fact in dispute, the moving party need only establish that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Where, however, there is a disputed issue of material fact, summary judgment is appropriate only if the factual dispute is not a genuine one. *Anderson*, 477 U.S. at 248. An issue of material fact is genuine if "a reasonable jury could return a verdict for the nonmoving party." *Id*. Where there is a material fact in dispute, the moving party has the initial burden of proving that: (1) there is no genuine issue of material fact; and (2) the moving party is entitled to judgment as a matter of law. *See* 2D Charles Alan Wright & Arthur R. Miller, Federal Practice and

Procedure § 2727 (2d ed.1983). The moving party may present its own evidence or, where the nonmoving party has the burden of proof, simply point out to the court that "the nonmoving party has failed to make a sufficient showing on an essential element of her case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

"When considering whether there exist genuine issues of material fact, the court is required to examine the evidence of record in the light most favorable to the party opposing summary judgment, and resolve all reasonable inferences in that party's favor." *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). Once the moving party has satisfied its initial burden, the burden shifts to the non-moving party to either present affirmative evidence supporting its version of the material facts or to refute the moving party's contention that the facts entitle it to judgment as a matter of law. *Anderson*, 477 U.S. at 256–57. The Court need not accept mere conclusory allegations, whether they are made in the complaint or a sworn statement. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990). And, "[t]o defeat summary judgment, [the non-moving party] 'cannot rest simply on the allegations in the pleadings,' but 'must rely on affidavits, depositions, answers to interrogatories, or admissions on file.'" *GFL Advantage Fund, Ltd. v. Colkitt*, 272 F.3d 189, 199 (3d Cir. 2001) (quoting *Bhatla v. U.S. Capital Corp.*, 990 F.2d 780, 787 (3d Cir. 1993)); *see also Tilden Fin. Corp. v. Palo Tire Serv., Inc.*, 596 F.2d 604, 608 (3d Cir. 1979).

"To prevail on a motion for summary judgment, the non-moving party must show specific facts such that a reasonable jury could find in that party's favor, thereby establishing a genuine issue of fact for trial." *Galli v. N.J. Meadowlands Comm'n*, 490 F.3d 265, 270 (3d Cir. 2007) (citing Fed. R. Civ. P. 56(e)). "While the evidence that the non-moving party presents may be either direct or circumstantial, and need not be as great as a preponderance, the evidence must be more than a scintilla." *Id*. (quoting *Hugh v. Butler Cnty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005)). In deciding a motion for summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

### B. Section 1983

Plaintiffs' claims against the Scranton Defendants are asserted pursuant to 42 U.S.C. § 1983. Section 1983 provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage ... subjects, or causes to be subjected, any citizen ... or any other person ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured." Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *City of Monterey v. Del Monte Dunes,* 526 U.S. 687, 749 n. 9 (1999) (quoting *Baker v. McCollan,* 443 U.S. 137, 144 n. 3 (1979)). "To establish liability under 42 U.S.C. § 1983, a plaintiff must show that the defendants, (1) acting under color of law, (2) violated the plaintiff's federal constitutional or statutory rights, (3) and thereby caused the complained of injury." *Elmore v. Cleary,* 299 F.3d 279, 281 (3d Cir. 2005) (citing *Sameric Corp. of Del., Inc. v. City of Phila.,* 142 F.3d 582, 590 (3d Cir. 1998)).

## II. Plaintiffs' § 1983 Claims

### A. Fourth Amendment Excessive Force Claim

Plaintiffs allege that the SPD officers violated Ms. Williams' constitutional rights by using excessive force against her. Corporal Stanek, Officer Smith, and Officer Knoch[3] argue that their use of force did not violate Ms. Williams' Fourth Amendment rights or, alternatively, that they are entitled to qualified immunity. (Doc. 97 at 21.)

Claims of excessive force are analyzed under the Fourth Amendment, not under the substantive due process framework of the Fourteenth Amendment.[4] *See Graham v.*

---

[3]     Although Plaintiffs bring a Fourth Amendment excessive force claim against Officer Jordan, it is undisputed that he did not shoot the decedent or exert any force against her. (Jordan Dep. at 60:6–10.) Accordingly, the Court will grant summary judgment in his favor on Plaintiffs' excessive force claim against him. *See Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988) ("[a] defendant in a [§ 1983] action must have personal involvement in the alleged wrongs").

[4]     Plaintiffs allege that the shooting of Ms. Williams by Corporal Stanek, Officer Smith, Officer Jordan, and Officer Knoch "was an unreasonable seizure in

*Connor*, 490 U.S. 386, 393–95 (1989). The Fourth Amendment protects "[t]he right of the people to be secure in their persons . . . against unreasonable . . . seizures." To prevail on a claim of excessive force, a plaintiff must show that a seizure occurred and that it was unreasonable. *See Abraham*, 183 F.3d at 288. Ms. Williams was seized when Corporal Stanek, Officer Smith, and Officer Knock shot her. *See Graham*, 490 U.S. at 395 n. 10 (citing *Terry v. Ohio*, 391 U.S. 1, 19 n. 16 (1968), for the proposition that a Fourth Amendment "seizure" occurres when government actors have, "by means of physical force or show of authority, . . . in some way restrained the liberty of a citizen."). The only question is whether the seizure was reasonable.

An officer's use of deadly force is reasonable only where "it is necessary to prevent escape and the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." *Tennessee v. Garner*, 471 U.S. 1, 3 (1985). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene" and in light of the "totality of the circumstances" confronting him. *Graham*, 490 U.S. at 396. Making this determination "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* The Third Circuit adds to this list "the duration of the action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with

violation of the Fourth Amendment . . . and a deprivation of her right to due process of law in violation of the Fourteenth Amendment . . . ." (Doc. 38 at ¶ 42.) Their expert, Andrew Scott, opines that the officers "failed to properly monitor and control [Ms. Williams'] movements" and "failed to provide a safe environment for her and themselves by allowing her to walk . . . into the kitchen and access weapons." (Doc. 99 at ¶ 42.) Plaintiffs contend that "[t]he officers created the situation where deadly force would be used." (Doc. 98 at 9.) Accordingly, Plaintiffs' Fourteenth Amendment claim relating to the shooting will be construed as a Fourteenth Amendment state-created danger claim.

9

whom the police officers must contend at one time." *Sharrar v. Felsing*, 128 F.3d 810, 822 (3d Cir. 1997). The basic question is as follows: "Giving due regard to the pressures faced by the police, was it objectively reasonable for the officer[s] to believe, in light of the totality of the circumstances, that deadly force was necessary to prevent the suspect's escape, and that the suspect posed a significant threat of death or serious physical injury to the officer or others?" *Abraham*, 183 F.3d at 289.

The Court agrees that no reasonable juror could find that the use of deadly force by Corporal Stanek, Officer Smith, and Officer Knoch violated Ms. Williams' Fourth Amendment rights. The undisputed facts show that Ms. Williams rapidly approached Officer Smith with a knife, ignored the officers' warnings to stop and drop the knife, and was within several feet of Officer Smith when she was shot. In light of the totality of the circumstances, the police officers had probable cause to believe that Ms. Williams posed a significant threat of death or serious physical injury to Officer Smith or any other officer on the scene. The Court thus finds that it was objectively reasonable for the officers to believe that the use of deadly force against Ms. Williams was necessary. Because their use of deadly force was reasonable, the Court finds that Corporal Stanek, Officer Smith, and Officer Knoch did not use excessive force against Ms. Williams. Accordingly, summary judgment will be granted in their favor on Plaintiffs' Fourth Amendment excessive force claims.

### B. Fourteenth Amendment Due Process Claims

Plaintiffs also allege that Corporal Stanek, Officer Smith, Officer Jordan, and Officer Knoch violated Ms. Williams' Fourteenth Amendment Due Process rights by shooting her and failing to provide her medical care. (Doc. 38 at ¶¶ 42, 44.)

### 1. Failure to Provide Medical Treatment Claim

A plaintiff may assert a Fourteenth Amendment substantive due process claim for deprivation of medical care "in limited circumstances." *Hogan v. City of Easton*, No. 04–759, 2004 WL 1836992, at *10 (E.D. Pa. Aug. 17, 2004). Police officers are liable for unconstitutional denial of medical assistance when there is (1) a serious medical

need and (2) acts or omissions by the police officers that indicate deliberate indifference to that need. *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 582 (3d Cir. 2003). A medical need is serious if it is "one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention." *Monmouth Cnty. Corr. Institutional Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987). Deliberate indifference is a "subjective standard of liability consistent with recklessness as that term is defined in criminal law." *Natale*, 318 F.3d at 582. The Third Circuit has found deliberate indifference "in situations where 'necessary medical treatment is delayed for non-medical reasons.'" *Id.* (quoting *Lanzaro*, 834 F.2d at 347).

It is undisputed that Ms. Williams had a serious medical need, as she had been shot and also fell on top of a knife. It is also beyond dispute that the SPD officers on the scene had an affirmative duty to provide medical care to her. *See Hogan*, 2004 WL 1836992, at *11 (finding that police officers had affirmative duty to provide medical care to citizen they had shot). The only question that remains is whether Corporal Stanek, Officer Smith, Officer Jordan, and Officer Knoch were deliberately indifferent to Ms. Williams' medical needs.

The facts show that an ambulance and two medical personnel were at Ms. Williams' apartment building at the time of the shooting, as Officer Smith had previously requested their presence for a possible 302 commitment. After Ms. Williams was shot, the police officers called for the medical personnel to treat her. The medical personnel arrived in Ms. Williams' apartment within seconds and began attending to her. She was examined, given CPR, and placed in an ambulance within minutes. She was then taken by ambulance to the Community Medical Center and was pronounced dead in their trauma center soon after. In light of these circumstances, the Court is compelled to conclude that there is no triable issue of fact as to whether the Defendant police officers exhibited deliberate indifference to Ms. Williams' serious medical needs. As no reasonable jury could find that the officers exhibited deliberate indifference to Ms. Williams' medical needs, summary judgment will be granted in favor of Corporal Stanek,

Officer Smith, Officer Jordan, and Officer Knoch on Plaintiffs' Fourteenth Amendment failure to provide medical treatment claim.

### 2. State Created Danger Claim

Plaintiffs' expert opines that the officers "failed to control [Ms. Williams'] movements" and "failed to provide a safe environment for her and themselves by allowing her to walk . . . into the kitchen and access weapons." (Doc. 99 at ¶ 38.) Plaintiffs contend that the officers' conduct leading up to the shooting violated Ms. Williams' Fourteenth Amendment Due Process rights. (Doc. 38 at ¶ 42.) The police officers argue that their conduct prior to the shooting does not rise to the level of a constitutional violation, as allowing Ms. Williams to momentarily enter the kitchen is neither deliberately indifferent nor conscience-shocking behavior. (Doc. 97 at 29, 35.)

"Individuals have a constitutional liberty interest in personal bodily integrity that is protected by the Due Process Clause of the Fourteenth Amendment," *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 235 (3d Cir. 2008), which provides that "[n]o State shall ... deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. The Due Process Clause, though, does not impose an affirmative obligation on the state to protect its citizens. *See DeShaney v. Winnebago Cnty. Dep't of Soc. Serv.*, 489 U.S. 189, 195–96 (1989). Instead, "[t]he Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security." *Id.* at 195. One exception to this general rule, however, arises under the "state-created danger" doctrine, where the state assumes responsibility for the safety of a person for whom it affirmatively creates or enhances a risk of danger. *See Kneipp*, 95 F.3d at 1208; *see also DeShaney*, 489 U.S. at 200 ("The affirmative duty to protect arises not from the State's knowledge of the individual's predicament . . ., but from the limitation which it has imposed on his freedom to act on his own behalf.") As the Third Circuit has noted, "the cases where the state-created danger theory has been applied were based on discrete, grossly reckless acts committed by the state or state actors using their peculiar positions as state actors, leaving a discrete plaintiff vulnerable

to foreseeable injury." *Kneipp*, 95 F.3d at 1208.

> A "state-created danger" claim has four elements:
>
> (1) the harm ultimately caused was foreseeable and fairly direct;
>
> (2) a state actor acted with a degree of culpability that shocks the conscience;
>
> (3) a relationship between the state and the plaintiff existed such that the plaintiff was a foreseeable victim of the defendant's acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state's actions, as opposed to a member of the public in general; and
>
> (4) a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all.

*Bright v. Westmoreland Cnty.*, 443 F.3d 276, 281 (3d Cir. 2006) (internal citations and quotation marks omitted). Plaintiffs must establish all four elements to prevail on their state-created danger claim, *see Sanford v. Stiles*, 456 F.3d 298, 311 (3d Cir. 2006), and the Court will address each element of in turn.

### a. Foreseeability of the Harm

To establish the first element of a state-created danger claim—that the harm ultimately caused to Ms. Williams was foreseeable and fairly direct—Plaintiffs must demonstrate "an awareness on the part of the state actors that rises to the level of actual knowledge or an awareness of risk that is sufficiently concrete to put the actors on notice of the harm." *Phillips*, 515 F.3d at 238; *see also D.N. ex rel. Nelson v. Snyder*, 608 F. Supp. 2d 615, 625 (M.D. Pa. 2009). In addition to the foreseeability component of the analysis, the harm must be "a 'fairly direct' result of the defendant's acts." *Phillips*, 515 F.3d at 239." This inquiry essentially asks whether the alleged misconduct and the harm caused were "too attenuated" to justifiably hold the defendant liable. *Snyder*, 608 F.Supp.2d at 625 (citing *Phillips*, supra, at 238).

Based on the evidence in this case, a reasonable juror could conclude that the SPD officers had a sufficiently concrete awareness of the risk posed by not securing the knives and later allowing Ms. Williams to enter the kitchen—that she could use a

13

knife as a weapon against the officers who, in turn, would likely have to use deadly force against her. Officers Smith and Jordan swept Ms. Williams' apartment for weapons and saw knives in the kitchen, but did not secure them because Ms. Williams did not have immediate access to them. When Corporal Stanek and Officer Knoch arrived at the apartment, Officer Jordan informed them that there were knives in the kitchen. When Ms. Williams was in the kitchen and Officer Smith heard the sound of metal clinking, he informed his fellow officers that there were knives in the kitchen. Officer Smith had prior interactions with Ms. Williams, who he believed to have "mental health issues," and on one occasion backed away from her because she appeared to want to assault him. In viewing this evidence, a reasonable juror could also determine that the harm caused to Ms. Williams was a fairly direct result of not securing the knives and allowing her to enter the kitchen. Summary judgment on this basis is not proper.

### b. Level of Culpability that "Shocks the Conscience"

"[B]ecause the culpability requirement is often the most difficult element for a plaintiff to prove, the outcome of a state-created danger case will often turn on this prong." *Sanford*, 456 F.3d at 305. There is, however, no precise definition for the term "shocks the conscience." Instead, a court must look to the circumstances of each particular case and determine whether the purported conduct shocks the conscience. *See Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998); *see also Miller v. City of Phila.*, 174 F.3d 368, 375 (3d Cir. 1999). Generally, the level of culpability required to shock the conscience increases as the time state actors have to deliberate decreases. *Sanford*, 456 F.3d at 306. In a "hyperpressurized environment," an intent to cause harm is usually required. *Id*. In cases where deliberation is possible and state officials have the time to make "unhurried judgments," deliberate indifference is sufficient. *Id*. Where circumstances require a state actor to make something less exigent than a "split-second" decision but more urgent than an "unhurried judgment", *i.e.*, a state actor is required to act "in a matter of hours or minutes," a court must consider whether a

defendant disregarded a "great risk of serious harm rather than a substantial risk."[5]  *Id.*

Courts have consistently held that mere negligence by the state will not "shock the conscience" for purposes of establishing a substantive due process claim.  *See, e.g., Lewis*, 523 U.S. at 848–49; *Schieber v. City of Phila.*, 320 F.3d 409, 419 (3d Cir. 2003).  "[T]he environment created by the state actors must be dangerous; they must know it to be dangerous; and ... [they] must have been at least deliberately indifferent."  *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 910 (citations omitted).

On the night of the shooting, Officers Smith and Jordan saw and noted that there were knives in the kitchen, but did not secure them because Ms. Williams could not immediately access them.  Officer Smith thought that Ms. Williams, who exhibited erratic and aggressive behavior in prior interactions with him, may have had mental health issues.  Based on Ms. Williams' behavior that evening, Officers Smith and Jordan summoned an ambulance and EMTs for a possible involuntary commitment.  Officers Smith and Jordan were of the opinion that it would have been proper to involuntarily commit Ms. Williams that night.  Corporal Stanek and Officer Knoch were told upon arriving at the apartment that knives were present in the kitchen, but neither officer secured the knives nor directed their fellow officers to do so.  As the officers were preparing to leave a few minutes later, Ms. Williams quickly moved from her bedroom to the kitchen.  She then emerged from the kitchen with a large knife and moved toward Officer Smith.  Based on this evidence, a reasonable juror could find that the officers disregarded a "great risk of serious harm"—*i.e.*, were grossly negligent— by not securing the knives and not preventing Ms. Williams from entering her kitchen.  Because a reasonable juror could find that the officers acted with a degree of culpability that shocks the conscience, it is inappropriate to grant summary judgment on this basis.

---

[5]      As nearly thirty minutes elapsed between the police arriving at Ms. Williams' apartment and the shooting, the Court finds that Plaintiffs must show that the officers disregarded a "great risk of serious harm"—*i.e.*, "gross negligence or arbitrariness that indeed shocks the conscience."  *Miller*, 174 F.3d at 371.

15

### c. "Foreseeable Plaintiff"

The third prong of the state-created danger analysis "requires that some relationship exist between the state and the plaintiff." *Phillips*, 515 F.3d at 242. The relationship requirement "contemplates some contact such that the plaintiff was a foreseeable victim of the defendant's acts in a tort sense." *Morse*, 132 F.3d at 912. "The relationship that must be established between the state and the plaintiff can be 'merely' that the plaintiff was a foreseeable victim, individually or as a member of a distinct class." *Phillips*, 515 F.3d at 242. "Such a relationship may exist where the plaintiff was a member of a discrete class of persons subjected to the potential harm brought about by the state's actions." *Id.* (citing *Morse*, 132 F.3d at 913; *Rivas v. City of Passaic*, 365 F.3d 181, 197 (3d Cir. 2004)). "The primary focus when making [the relationship] determination is foreseeability." *Morse*, 132 F.3d at 913. In viewing the evidence in this matter, a reasonable juror could find that Ms. Williams was a foreseeable victim of the officers' conduct (*i.e.*, failing to secure the knives or prevent Ms. Williams from entering her kitchen) in a tort sense. Accordingly, summary judgment is not appropriate on this basis.

### d. "Affirmative" Acts

Under the fourth element, "[l]iability under the state-created danger theory is predicated upon the states' affirmative acts which work to the plaintiffs' detriment in terms of exposure to danger." *D.R. by L.R. v. Middle Bucks Area Vo. Tech. Sch.*, 972 F.2d 1364, 1374 (3d Cir. 1992) (en banc). Although the Third Circuit has acknowledged that the line between action and inaction may not always be clear, *id.*, it has never found a state-created danger claim to be meritorious without a showing that state authority was affirmatively exercised. *Phillips*, 515 F.3d at 236. Third Circuit jurisprudence requires a plaintiff to show an affirmative action, rather than inaction or omission. *Bright*, 443 F.3d at 282. The three necessary conditions to satisfy this element of a state-created danger claim are that: (1) a state actor exercised his or her authority, (2) the state actor took an affirmative action, and (3) this act created a danger

16

to the citizen or rendered the citizen more vulnerable to danger than if the state had not acted at all. *Id.* at 281–82. More fundamentally, there needs to be a "direct causal connection" between the acts or omissions of the state and the harm which befell the victim. *Morse*, 132 F.3d at 915.

The Court finds that, based on the evidence, a reasonable juror could not find that the Defendant officers committed affirmative acts which exposed Ms. Williams to danger. The conduct emphasized by Plaintiffs and their expert—that the SPD officers *did not* secure the knives or prevent Ms. Williams, who was not under arrest and deemed not to be a danger to herself or others, from entering her kitchen—cannot be characterized as affirmative acts. Rather, this conduct shows inaction by the police. Because Plaintiffs have not presented evidence that the Defendant officers committed affirmative acts which worked to Ms. Williams' detriment in terms of exposure to danger, they have failed to meet the fourth prong of their claim. As Plaintiffs cannot meet the fourth prong of their state-created danger claim, summary judgment will be granted in favor of Corporal Stanek, Officer Smith, Officer Jordan, and Officer Knoch on this claim.

In sum, summary judgment will be granted in favor of Corporal Stanek, Officer Smith, Officer Jordan, and Officer Knoch with respect to Plaintiffs' Fourth and Fourteenth Amendment claims because a reasonable juror could not find that the officers violated Ms. Williams' constitutional rights.[6]

---

[6] Plaintiffs' expert opines that "Corporal Stanek failed to properly direct and supervise the other officers on the scene involving Ms. Williams, ultimately resulting in [her] demise." (Doc. 99, Ex. D at 14.) Supervisory liability may be imposed under § 1983 if a supervisor "participated in violating plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in his subordinates' violations." *Santiago v. Warminster Twp.*, 629 F.3d 121, 129 (quoting *A.M. ex rel. J.M.K. v. Luzerne Cnty. Juvenile Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004)). As no reasonable juror could find that the Defendant officers violated Ms. Williams' Fourth or Fourteenth Amendment rights, supervisory liability against Corporal Stanek is inappropriate in this matter.

### C. *Monell* Claims

Plaintiffs also bring *Monell* claims for municipal liability against the City on three theories: (1) the City failed to establish adequate rules, regulations, policies, or procedures regarding the manner in which its police officers should respond to mentally ill citizens, (2) the City failed to adequately train and/or supervise its police officers regarding proper procedures for their response to mentally ill citizens, and (3) the City failed to train Officer Smith, Officer Jordan, Officer Knoch, and Corporal Stanek, which resulted in their conduct which resulted in Ms. Williams' death. In light of the disposition of Plaintiffs' Fourth and Fourteenth Amendment claims against the Defendant SPD officers, these claims likewise fail. *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986). However, assuming *arguendo*, that the officers violated Ms. Williams' constitutional rights, Plaintiffs' *Monell* claims against the City would fail nonetheless.

Municipalities and other local government entities may not be held liable under § 1983 for the acts of their employees under a theory of *respondeat superior* or vicarious liability. *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 403 (1997); *see also Colburn v. Upper Darby Twp.*, 946 F.2d 1017, 1027 (3d Cir. 1991). However, a municipality may be held liable if the plaintiff can "identify a municipal 'policy' or 'custom' that caused the plaintiff's injury" and satisfy "rigorous standards of culpability and causation." *Brown*, 520 U.S. at 403, 405. A policy is an official proclamation or edict of a municipality, whereas a custom is a practice that is "so permanent and well settled as to virtually constitute law." *Beck v. City of Pittsburgh*, 89 F.3d 966, 971 (3d Cir. 1996) (quoting *Andrews v. City of Phila.*, 895 F.2d 1469, 1480 (3d Cir. 1990) (citations omitted)). A custom need not be "formally approved by an appropriate decisionmaker," but must be "so widespread as to have the force of law. *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 584 (3d Cir. 2003) (quoting *Brown*, 520 U.S. at 404).

A municipality may be held liable for constitutional violations that result from inadequate training or supervision of its employees if the failure to train constitutes a custom of the municipality. The failure must "amount[ ] to deliberate indifference to the

18

constitutional rights of persons with whom the police come in contact." *Colburn*, 946 F.2d at 1028 (citing *City of Canton v. Harris*, 489 U.S. 378, 385 (1989)). The Third Circuit has also held that the failure to adopt a needed policy can result in municipal liability in an appropriate case, and has analyzed that question of municipal liability using the deliberate indifference test. *See Natale*, 318 F.3d at 758.

Deliberate indifference is a difficult standard for a plaintiff to satisfy in this context. *Reitz v. Cnty. of Bucks*, 125 F.3d 139, 145 (3d Cir. 1997). It requires that "(1) municipal policymakers know that employees will confront a particular situation; (2) the situation involves . . . a history of employees mishandling; and (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights." *Carter v. City of Phila.*, 181 F.3d 339, 357 (3d Cir. 1999). The plaintiff must demonstrate that a "policymaker ignored a known or obvious risk," *Grillone v. City of Phila.*, No. 02-CV-6916, 2003 WL 21293801, at *4 (E.D. Pa. Mar. 10, 2003) (citing *Brown*, 520 U.S. at 404), and that the municipality's "deliberate conduct . . . was the 'moving force' behind the injury alleged." *Reitz*, 125 F.3d at 145 (quoting *Brown*, 520 U.S. at 404). "A need for training or other corrective action to avoid imminent deprivations of a constitutional right must be so apparent that any reasonable policymaker or supervisor would have taken appropriate preventive measures." *Strauss v. Walsh*, No. 01-CV-3625, 2002 WL 32341791, at *3 (E.D. Pa. Dec. 17, 2002); *Garcia v. Cnty. of Bucks*, 155 F. Supp. 2d 259, 268 (E.D. Pa. 2001). Recovery also requires that the failure to train be "closely related to the ultimate [constitutional] injury." *Woloszyn v. Cnty. of Lawrence*, 396 F.3d 314, 325 (3d Cir. 2005).

### 1. Failure to Supervise

Plaintiffs have provided no evidence that the City was deliberately indifferent in supervising Corporal Stanek, Officer Smith, Officer Jordan, and Officer Knoch. Plaintiffs' expert opines that the City failed to supervise Officer Smith, Officer Jordan, and Officer Knoch, but does not support this statement in his report. Rather, he focuses on how Corporal Stanek failed to properly supervise his subordinate officers

19

and challenges Corporal Stanek's decision not to involuntarily commit Ms. Williams. (Doc. 99, Ex. D at 14–16.) This argument pertains to Corporal Stanek's potential supervisory liability, which the Court has already addressed, rather than the City's potential municipal liability. Furthermore, although Plaintiffs' expert opines that the City failed to properly supervise Corporal Stanek pursuant to "standard police practices and procedures," the only support offered for this opinion is Corporal Stanek's "lack of training and lack of knowledge" regarding 302 commitments and dealing with mentally ill citizens. (Doc. 99, Ex. D at 14–16.) This conclusory statement neither evidences deliberate indifference on the part of the City with respect to supervising its officers nor identifies a specific supervisory practice that the City failed to employ. *See, e.g., Sample v. Diecks*, 885 F.2d 1099, 1118 (3d Cir. 1989). At best, it addresses the City's alleged failure to train its officers on such matters. Because no reasonable juror could find that the City failed to properly supervise Corporal Stanek, Officer Smith, Officer Jordan, and Officer Knoch, summary judgment will be granted in the City's favor on Plaintiffs' failure to supervise *Monell* claim.

### 2. Failure to Train and Failure to Adopt Policies

Plaintiffs' expert opines that the City "provided no specialized training for its officers to handle and deal with mentally ill citizens" and "failed to properly train its officers regarding 302 commitments utilized by law enforcement officers throughout the State of Pennsylvania." (Doc. 99, Ex. D at 12.) He cites the deposition testimony of Corporal Stanek, Officer Smith, Officer Jordan, and Officer Knoch, who did not recall the SPD promulgating any policy or conducting any training regarding 302 commitments or dealing with mentally ill citizens prior to Ms. Williams' death. (*Id.*) He also notes that the SPD proposed a policy in 2000 that addressed situations involving mentally ill individuals and possible 302 commitments. (*Id.* at 13; Doc. 99, Ex. C.) The proposed policy directed officers in situations involving individuals who may be mentally ill to determine whether the individual is an immediate threat to themselves or others and if any weapons are involved or accessible to the individual. (*Id.*) Although the police

20

officers' union rejected the proposed policy, which they did not participate in creating (Doc. 99, Ex. D at 13), Corporal Stanek testified that its procedures were informally implemented by the SPD and its officers (Stanek Dep. at 20:2–21:6).

Based on this evidence, no reasonable juror could conclude that the City acted with deliberate indifference with respect to the rights of its mentally ill citizens. In light of the proposed policy, it is clear that the SPD knew that its officers would confront mentally ill individuals who might pose a danger to themselves or others and thus need to be committed involuntarily. However, Plaintiffs have not provided any evidence that shows a pattern of violations of mentally ill individuals' rights resulting from the SPD's alleged failures to train or adopt sufficient policies. Plaintiffs have not pointed to any other incidents where mentally ill individuals have been killed, injured, or otherwise had their constitutional rights violated by SPD officers. *See Connick v. Thompson*, 131 S. Ct. 1350, 1360 (2011) ("A pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train.") (citations omitted). Because Plaintiffs have not produced evidence that the City acted with deliberate indifference to the constitutional rights of its mentally ill citizens, summary judgment will be granted in the City's favor with respect to Plaintiffs' failure to train and failure to adopt a needed policy *Monell* claims.

### III. Plaintiffs' State Law Claims

Plaintiffs also bring wrongful death and survival claims against the Scranton Defendants pursuant to Pennsylvania state law.[7] *See* 42 PA. CONS. STAT. §§ 8301, 8302. The Scranton Defendants argue that they are immune to these claims under the Pennsylvania Political Subdivision Tort Claims Act (PSTCA). *See* 42 PA. CONS. STAT. §§ 8541 *et seq.*

---

[7] Despite the labeling in Plaintiffs' complaint, "wrongful death and survival actions are not substantive causes of action; rather, they provide a vehicle through which plaintiffs can recover for unlawful conduct that results in death." *Sullivan v. Warminster Twp.*, 765 F. Supp. 2d 687, 707 (E.D. Pa. 2011).

The PSTCA makes local agencies immune from state law tort claims (with a few exceptions not applicable here).[8]  42 PA. CONS. STAT. §§ 8541–42.  The City of Scranton qualifies as a local agency under the PSTCA.  *See id.* § 8501.  Therefore, it has immunity under the statute and summary judgment will be granted in its favor on Plaintiffs' wrongful death and survival claims.

The PSTCA grants municipal employees the same immunity as agencies, *id.* § 8545, except that employees are liable for their conduct if it amounted to "actual malice" or "willful misconduct," *id.* § 8550.  The Pennsylvania Supreme Court has generally held that "the term 'willful misconduct' is synonymous with the term 'intentional tort.'" *Sanford v. Stiles*, 456 F.3d 298, 315 (3d Cir. 2006) (quoting *Renk v. City of Pittsburgh*, 537 Pa. 68, 641 A.2d 289, 293 (1994)); *see also Owens v. City of Phila.*, 6 F. Supp. 2d 373, 394 (E.D. Pa. 1998) ("The *Renk* decision construed 'willful misconduct' to mean 'misconduct which the perpetrator recognized as misconduct and which was carried out with the intention of achieving exactly that wrongful purpose.'") (internal citations omitted).  As Plaintiffs point to no evidence to show that the officers recognized their actions to be misconduct or acted with the intention of bringing about Ms. Williams' death, they cannot demonstrate that the officers' conduct amounted to willful misconduct or actual malice.  Accordingly, summary judgment will be granted in favor of Corporal Stanek, Officer Smith, Officer Jordan, and Officer Knoch on Plaintiffs' wrongful death and survival claims.

## CONCLUSION

For the aforementioned reasons, the Scranton Defendants' Motion for Summary

---

[8]    The PSTCA's exceptions allow liability against agencies for: (1) the operation of a motor vehicle in the possession or control of a local agency; (2) the care, custody or control of personal property in the possession or control of a local agency; (3) the care, custody or control of real property; (4) a dangerous condition created by trees, traffic controls, or street lights; (5) a dangerous condition of utility service facilities; (6) a dangerous condition of streets; (7) a dangerous condition of sidewalks; and (8) the care, custody or control of animals in possession or control of a local agency.  42 PA. CONS. STAT. § 8542.

Judgment (Doc. 90) will be granted.

An appropriate order follows.


April 1, 2013                                        /s/ A. Richard Caputo

Date                                                 A. Richard Caputo
                                                     United States District Judge